**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**WILLIAM DAVID JONES,**

> **Plaintiff,**

v.

**Civil Action No. 3:21cv288**

**DEPARTMENT OF DEFENSE
DEFENSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER,
RICHMOND**

> **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Department of Defense Defense

Logistics Agency Defense Supply Center, Richmond's ("DLA," "DSCR," or "the Government")

Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, Motion for

Summary Judgment (the "Motion"). [1] (ECF No. 41.)[2] Plaintiff William David Jones, proceeding

*pro se*, responded in opposition to the Motion, (ECF No. 43), and DLA replied, (ECF No. 44).

The matter is ripe for disposition. The Court dispenses with oral argument because the

materials before it adequately present the facts and legal contentions, and argument would not

aid in the decisional process. Thus, the Court DENIES Mr. Jones's Motion for a Hearing. (ECF

No. 47.)

---

[1] Defendant included a notice consistent with the requirements set forth in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Civil Rule 7(K). (ECF No. 41.) The *Roseboro* Notice informed Mr. Jones that he had twenty-one (21) days to respond and that failure to respond could result in dismissal of his claims.

[2] The Court employs the pagination assigned by the CM/ECF docketing system. The Court corrects the spelling, punctuation, and capitalization in the quotations from the parties' submissions. The Court omits any secondary citations from the parties' submissions.

For the reasons that follow, the Court grants DLA's Motion.  (ECF No. 41.)  The Court

will enter summary judgment for the Government as to Mr. Jones's APA Debarment Claim and

FOIA Claim, and the Court will dismiss the remaining claims.[3]

### I.  Factual and Procedural Background

A.     **Factual Background**[4]

   1.     **Mr. Jones's Employment, the Incident Report, and Mr. Jones's
          Eventual Resignation**

Mr. Jones was employed as an Operations Research Analyst[5] at the Defense Logistics

Agency ("DLA") Aviation, an agency within the Department of Defense ("DoD"), at the

Defense Supply Center, Richmond ("DSCR").  (AR at 889.)  In 2016, Mr. Jones and a DLA

coworker, Natalie Seiling, began a two-year "off and on" extramarital affair; both Mr. Jones and

Ms. Seiling were married to separate partners during the span of their relationship.  (AR at 931–

---

[3] While the Court is disinclined to analyze a same-filed motion under different rules, the Court will do so here due to the convoluted record, Mr. Jones's *pro se* status, and because this is the third opportunity the Court has given Mr. Jones to file a proper complaint.

[4] As will be discussed, Mr. Jones brings this suit in part as a challenge of DLA's decision to bar him from entering DLA.  "In an APA suit challenging agency action, review is limited to the administrative record and 'resolution . . . does not require fact finding on behalf of [the] court." *Hyatt v. U.S. Pat. & Trademark Off.*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (quoting *Nw. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994)).  Therefore, "the ordinary summary judgment standard under Rule 56(c) [of the Federal Rules of Civil Procedure] does not apply.  In other words, the presence or absence of a genuine dispute of material fact is not in issue, as the facts are all set forth in the administrative record." *Hyatt*, 149 F. Supp. at 780.  In an APA agency review case, "summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA.'" *Hyatt*, 149 F. Supp. at 780 (quoting *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006)).

[5] Mr. Jones contends he "was hired as a '*Senior* Operations Research Analyst.'"  (ECF No. 43, at 3.)  However, the Notification of Personnel Action form which shows his resignation lists his position title as "Operations Research Analyst."  (AR. at 889.)  Regardless, whether he was a "Senior" analyst is immaterial to this matter.

32.) On September 13, 2018, Jennifer Morasco, another DLA employee, filed an incident report with DLA police alleging harassment by Mr. Jones.[6] (AR at 931.) DLA police, after obtaining sworn statements from Ms. Morasco, Ms. Seiling, and Mr. Jones, reported the following in its September 17, 2018 Incident Narrative:

- Ms. Seiling stated that Mr. Jones and Ms. Seiling had been involved in a two-year, on-again, off-again extra-marital affair, which ended in March 2018.
- Ms. Seiling stated that after the relationship ended in March 2018, Mr. Jones continuously attempted to contact Seiling by email, text, and telephone.
- Ms. Seiling stated Mr. Jones's advances to Ms. Seiling were unwelcome.
- Ms. Seiling stated that Mr. Jones spread "vicious rumors" about Ms. Seiling and "embarrassed her to the point that she [did] not want to come to work."
- Ms. Seiling stated that Mr. Jones sent suicidal, threatening, and defamatory emails and text messages to Ms. Seiling.
- Ms. Morasco stated that Mr. Jones sought to have Ms. Morasco intervene on his behalf with Ms. Seiling. When Ms. Morasco resisted, Mr. Jones grabbed her arm and insisted she contact Ms. Seiling.
- Ms. Morasco feared for her personal safety due to Mr. Jones's "increasingly unpredictable and violent behavior."
- Ms. Morasco stated that Mr. Jones wrote a love letter to Ms. Seiling and asked Ms. Morasco to deliver it. Instead of delivering it to Ms. Seiling, Ms. Morasco delivered the letter to her supervisor who then contacted the DLA Police.
- Mr. Jones stated that he was being harassed by Ms. Seiling and that he was in fear of his life because Ms. Seiling had several guns in her possession.

(AR at 931–32.)

---

[6] Mr. Jones asserts that Morasco later texted him recanting her allegations against him. (ECF No. 43, at 3.) Mr. Jones contends that "in a series of text messages between [Ms.] Morasco and [himself]," Ms. Morasco revealed to [him] that [Mr. Jones's Supervisor, John Wait] deliberately supplied false information to her in an effort to cause harm to [Mr.] Jones" and that "[Mr.] Wait coerced [Ms.] Morasco to elicit what [Ms.] Morasco herself called a false sworn statement . . . . [by stating] that [Mr.] Jones had sent a plethora of e-mails to [Mr.] Wait regarding [Ms.] Morasco's family and safety." (ECF No. 43, at 2–3.) While the Court understands that Mr. Jones states under penalty of perjury that Ms. Morasco's statement in the Incident Report was coerced, the Court finds that Mr. Jones concedes the principal fact that Ms. Morasco provided sworn statements to DLA police. Ms. Morasco's sworn statements, as summarized in the DLA police's Incident Narrative, are in the administrative record at page 931.

On September 14, 2018, Mr. Jones's supervisor, John Wait, wrote that he was "requiring [Mr. Jones] to telework next Monday through Friday."[7] (AR at 211–12.) On September 20, 2018, Teresa Smith, DLA's Chief Data Officer, issued an order to Mr. Jones prohibiting any direct or indirect contact with either Ms. Seiling or Ms. Morasco.[8] (AR at 451–52, 606.) That same day, Chief Data Officer Smith filed a Commander Directed Inquiry to initiate a DLA investigation into Ms. Seiling's and Ms. Morasco's complaints of alleged harassment, misconduct, and hostile work environment against Mr. Jones.[9] (AR at 879.)

---

[7] Mr. Jones attempts to dispute this fact by alleging that Mr. Wait's order to Mr. Jones "violated PL 111-292" which "makes it very clear that telework is *voluntary*, and OPM makes it quite clear that *no agency may order an employee to telework*." (ECF No. 43, at 5.) Whether or not Mr. Wait violated a regulation has no bearing on whether the action occurred. Accordingly, the Court concludes that this fact is immaterial.

[8] Mr. Jones seemingly seeks to dispute this fact by contending that his "signature is not on the document displayed in AR at []606" and that "[t]he unsigned document is not conclusive evidence that the no-contact orders were administered properly, which contradicts the defendant's statement that the no-contact orders were completed correctly, recorded properly, and that [Mr.] Jones later violated the no-contact orders." (ECF No. 43, at 5.) However, the Government simply asserts that "[o]n September 20, 2018, Teresa Smith . . . issued an order to Plaintiff prohibiting any direct or indirect contact with [Ms.] Seiling, which Plaintiff acknowledged receiving." (ECF No. 42, at 3.) Furthermore, the Court notes that in Mr. Jones's Second Amended Complaint, he states, "On . . . [September 20, 2018], [Chief Data Officer] Smith instructed Mr. Jones to sign and return two no-contact orders regarding DLA employees [Ms.] Seiling and [Ms.] Morasco. . . . Mr. Jones complied with [Chief Data Officer] Smith." (ECF No. 38, at 6.) The record further demonstrates that Mr. Jones acknowledged receipt. In an email he states, "I acknowledge receipt, but there is no way for me to return the document with a digital signature." (AR at 451.) Accordingly, the Court concludes that this fact is undisputed.

[9] Mr. Jones contends that the United States "offers no documentation that supports this statement, other the CDI summary dated [February 8, 2019] signed by the apparent investigator." (ECF No. 43, at 5.) The Court finds, however, that the cited documents properly support the United States' statement. *See* (AR at 879–87). Mr. Jones further asserts that the "record is incomplete" because the United States "has failed to include the documentation from the agency which authorized the investigation, when it was initiated, who actually initiated, what allegations were made, who made the allegations, when the allegations were made, and who approved the CDI." (ECF No. 43, at 6.) However, the documentation Mr. Jones seeks is unnecessary to support the stated fact. Lastly, in Mr. Jones's Second Amended Complaint, he asserts "Jones learned that Smith requested a commander-directed investigation through Hurry's office on or

On September 28, 2018, Ms. Seiling sought a protective order against Mr. Jones in the Chesterfield General District Court. (AR at 580–82.) The Chesterfield General District Court Judge, however, dismissed Ms. Seiling's protective order, stating that there were "no acts of force, violence or threats against petitioner." (AR at 583.) Ms. Seiling appealed this decision, but then withdrew her appeal. (AR at 585, 594.)

On October 24, 2018, Mr. Jones, escorted by a member Security and Emergency Services, met with an administrative investigator at DSCR. (AR at 954.) During the meeting, Mr. Jones provided information and evidence in mitigation of Ms. Seiling's and Ms. Morasco's allegations. (AR at 954.) After the meeting, Mr. Jones was escorted off the installation and advised to await instructions regarding his work status. (AR at 954.) On the same day, members of Security and Emergency Services, DLA Police, DLA Legal Counsel, and Mr. Jones's leadership team held a meeting to discuss Mr. Jones's suitability to return to work on the installation. (AR at 954.) The meeting participants dubbed Mr. Jones's conduct "strange and somewhat concerning" but found that "he had committed no crime, nor made any overt threat of physical violence." (AR at 954.) They decided to allow Mr. Jones to return to work at DSCR, but to assign him to a different directorate so that contact between him, Ms. Seiling, and Ms. Morasco would be avoided. (AR at 954.) On October 25, 2018, DSCR removed all restrictions regarding Mr. Jones's access. (AR at 954.)

On November 14, 2018, Ms. Seiling sent an email with the subject line "frightened - please help stop this," to various DLA officials stating that she felt threatened by Mr. Jones's

---

about [September 20], 2018." (ECF No. 38, at 6–7.) Accordingly, the Court concludes that any dispute as to this fact is immaterial.

recent behavior. (AR at 892.) She attached several recent Facebook posts made by Mr. Jones to the email.[10] (AR at 892-915.)

On November 14, 2018, Chief Data Officer Smith sent Mr. Jones a letter, informing Mr. Jones that he had been placed on paid administrative leave, effective immediately, pending completion of the Agency's investigation into the complaints against him. (AR at 891.) The letter also explained that if Mr. Jones needed access to the installation for any reason, he must contact Mr. Wait for approval. (AR at 891.)

On November 17, 2018, Mr. Jones submitted his resignation to DLA. (AR at 636.) In his resignation letter, Mr. Jones stated that his reasons for resigning were "personal" and that he had "determined that the goals, mission, and vision of [the] organization are not in line with [his] own and [that he had] found better opportunity elsewhere." (AR at 636.)

### 2.   The Threat Assessment and the Resulting Barment Package

On November 26, 2018, Don Bartlett, a DLA Criminal Intelligence Analyst, completed the Threat Assessment on Mr. Jones (the "Threat Assessment" or "Assessment"). (AR at 953–61.) The Threat Assessment's purpose was to "provide analysis of [Mr. Jones's] recent behavior and conduct . . . and to assess any threat he may potentially pose to the DSCR workforce." (AR at 953.) The Assessment described and evaluated several of Mr. Jones's actions after he was allowed to return to DSCR on October 25, 2018. (AR at 953–61.)

---

[10] Mr. Jones contends that "an inspection of [the] so-called social media posts reveals that the persons who allegedly downloaded Mr. Jones'[s] alleged social media posts are *not* Seiling." (ECF No. 43, at 7.) Who downloaded the Facebook posts is irrelevant to this matter. While Mr. Jones contends that "Seiling has supplied third-party 'evidence' that uniformly fails to meet the standards of the Federal Rules of Evidence," (ECF No. 43, at 7), "[i]n an APA suit challenging agency action, review is limited to the administrative record." *Hyatt v. U.S. Pat. & Trademark Off.*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (quoting *Nw. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994)). The Facebook pages are available in the administrative record at 893-915.

For instance, the Assessment addressed an October 25, 2018 email that Mr. Jones sent to Chief Data Officer Smith, which included text such as:

> I will not mince words. . . . I have been treated as if I were in a gulag and NOT as an American citizen who spent 21 years of MY LIFE defending the rights guaranteed by the Constitution of the United States of America for ALL people.

> I have done NOTHING to deserve this treatment. . . . I have been vilified, I have been wrongfully labeled. . . . I did not have one advocate rooting for me. . . .

> When the truth outs who [Seiling] is and what she does on GOVERNMENT TIME . . . perhaps then the rally behind her will fall to nothing, and a tinkling brass will be the only sound that anyone hears.  That is when I will feel truly vindicated. . . .

> As I once wrote to someone else, "May God have mercy on every party associated with these tragic events. No one will be the same again. I certainly will not be the same."

(AR at 954–55.)  The Assessment stated that the email was indicative of "grievance building" and "allegations of persecution or prejudicial treatment," both of which were "common pre-violence indicators exhibited by those who have committed workplace violence, active shooter, or mass-casualty attacks."  (AR at 955.)  In addition, the Assessment explained that Mr. Jones's language regarding "a tinkling brass" represented an implied threat, "likely [a] reference to a bullet's brass shell casing hitting the floor after being ejected from a firearm."  (AR at 955.)

The Threat Assessment also addressed several Facebook posts made by Mr. Jones on October 26, 2018.  (AR at 955–56.)  The Assessment explained that the language used in several of the October 26, 2018 Facebook posts was "indicative of an apparent obsession with a supervisor, co-worker or employee grievance," and that the language was "also indicative of the pre-violence indicators of constant anger and belligerent behavior."  (AR at 956.)  Excerpts of these Facebook posts included text such as: "HATING YOU would require an emotional commitment," "I'm not perfect[;] I'll annoy you, make fun of you, say stupid things, but you'll never find someone who loves you as much as I do," and "[a]ll the feelings I ever had for you

7

just went that a way [sic], no [sic] go f\*\*\* yourself." (AR at 955–56.) The Assessment also

included three additional Facebook posts made by Mr. Jones on October 26, 2018. In one of the

posts, Mr. Jones stated:

> I KNOW THAT YOU ARE STALKING ME AND MY PAGE, AND I
> GUARANTEE THAT I WILL WORK TO MAKE SURE YOU FACE THE
> HARSHEST CONSEQUENCES DETAILED IN THE REGULATIONS. . . . AND
> WHEN YOU FACE THE CONSEQUENCES, YOU REMEMBER ONE THING:
> YOU ARE NOTHING BUT A DAMN LIAR, AND YOU JUST SCREWED
> YOUR NARCISSISTIC SELF.

(AR at 955). In another post, Mr. Jones posted a video of a burning fire with the
message:

> FOR THOSE WHO ARE PERPLEXED, THERE IS A SILVER RING IN THE
> FIRE THAT WAS TAKEN FROM MY HOME WITHOUT MY PERMISSION;
> THAT RING WAS RETURNED TO ME . . . CONTAMINATED …… THE
> FIRE PURGED THE CONTAMINATION … I'LL CARRY THIS RING ON A
> KEY CHAIN … AS A REMINDER OF THE PERSON WHO TOOK THE
> RING … AND THANK GOD THAT THAT PERSON IS NOW SUBJECT TO A
> FULL DAMNATIO MEMORIAE[11]

(AR at 956) (second, third, fourth, and fifth ellipses in original). The Assessment concluded that

these social media postings were "indicative of the pre-violence indicators of constant anger and

vindictive references." (AR at 956.)

In addition, the Threat Assessment analyzed an October 26, 2018 event during which

Mr. Jones allegedly approached Ms. Seiling in the hallway of the Chesterfield County Small

Claims Court and attempted to force a conversation with her, an interaction that occurred after

DLA Human Resources had issued the no contact order. (AR at 956.) Mr. Jones and

Ms. Seiling were at the courthouse that day pursuant to a suit filed by Mr. Jones to require the

---

[11] *Damnatio memoriae* is a Latin phrase which translates to "condemnation of memory."
The term refers broadly to the attempted erasure, usually posthumously, of the memory of
ancient Roman leaders who had attained disfavor from controlling authorities.

return of four personal items allegedly in Ms. Seiling's possession.  (AR at 956.)  According to

Ms. Seiling, Mr. Jones walked up to her and stated, "[w]e need to talk," and then he became loud

after she initially ignored him.  (AR at 956.)  Mr. Jones continued his attempts to "forcefully

engage [Ms. Seiling] in conversation," until her attorney intervened, and Ms. Seiling left the

area.  (AR at 956.)  The Assessment classified Mr. Jones's behavior as "pre-violence indicators

of belligerent behavior, constant anger[,] and controlling behavior."  (AR at 956.)

The Threat Assessment also evaluated a Facebook post that Mr. Jones made on

November 4, 2018.  (AR at 956.)  In the Facebook post, Mr. Jones declared: "JUDGMENT IS

WAITING FOR YOU.  I don't care what happens to you when JUDGMENT is passed on to

you.  YOU reap what YOU sow . . . and you have sown a lot."  (AR at 956.)  The Assessment

classified the post as "indicative of the pre-violence indicators of constant anger and vindictive

references."  (AR at 956.)

The Assessment also considered several Facebook posts made by Mr. Jones on

November 9, 2018.  (AR at 956–57.)  In one of these posts, Mr. Jones declared:

> I sent you a good number of emails months ago asking you to consider your actions
> and reason things out with me.  That time has pretty much passed.  You have no
> desire to be nothing more than an evil, cold-hearted, sadistic narcissistic woman.

(AR at 956.)  In another post from that date, Mr. Jones wrote:

> Advice: When you go to EEO, don't lie to the councilors [sic]. Don't change your
> stories . . . . . . just imagine what I said about YOU. S\*\*THEAD B\*\*CH. F\*\*KING
> PIECE OF GARBAGE.

(AR at 957.) (ellipses in original).  In a third post, Mr. Jones stated:

> [T]he filthy of humanity . . . progeny of Satan himself . . . I labeled you as slutty
> garbage . . . forever. Amen.

(AR at 957.)  An additional post included the text:

> I am now on the attack . . . I let go of the love I had for her . . . now I am releasing
> the hate and contempt she had for me while she used me for the last 2 1/2 years.
> There's a lot of hate left.

(AR at 957.) The Assessment classified these posts as pre-violence indicators of constant anger,

vindictive references, and malicious references. (AR at 957.)

The Assessment also addressed Facebook posts made by Mr. Jones on November 12,

2018. (AR at 957.) In one post, Mr. Jones included photos of a ring being burned in fire with

the comment, "The ring was still not pure.... I cleansed it with fire again." (AR at 957.) (ellipses

in original). Another post, referring to the ring, read "Never again to be worn by the unclean."

(AR at 957.) The Assessment explained that "it [was] apparent [Mr. Jones] had given the ring to

[Ms. Seiling] which she subsequently returned." (AR at 957.) That same day, Mr. Jones also

created a Facebook post addressed to "Becky." (AR at 957.) The Assessment explained that

Becky presumably referred to Seiling. (AR at 957.) The Facebook post stated:

> Becky is about to feel the full wrath of my patience. My attorney and I are about
> to deliver Becky a piece of paper that is going to change her life . . . and I have
> entreated Becky to contact me before we drop this SURE WINNING TICKET
> that we will execute in full force. Becky doesn't seem to be responding to my
> offer to talk… BECKY, I HAVE HAD ENOUGH MY DAY HAS COME, AND
> MY VOICE, WHICH HAS BEEN SILENT, NOW SPEAKS LOUDLY AND
> CLEARLY . . . . I WILL NOT STOP UNTIL YOU FEEL EVERY LIE YOU
> TOLD ABOUT ME, EVERY EVIL DEED THAT YOU ENGAGED IN IS
> OVERTURNED AND BROUGHT TO LIGHT AND YOU ARE GOING TO
> PAY FOR WHAT YOU HAVE DONE TO ME.

(AR at 957–58.) (ellipses in original). The Assessment classified the November 12, 2018 posts

as "indicative of an apparent obsession with a supervisor, a co-worker or employee grievance,"

and "indicative of the pre-violence indicators of constant anger, vindictive references, litigious

activities, and making threats/utterances pertaining to getting even." (AR at 958.)

Lastly, the Threat Assessment analyzed a November 15, 2018 Facebook post

in which Mr. Jones stated:

> I AM DEFINITELY SUING DLA. . . AND FOR YOU HYPOCRITE LEADERS WHO ARE READING THIS, I AM CONSIDERING SUING YOU, TOO. INDIVIDUALLY.  YOU ARE RESPONSIBLE FOR ENSURING CLARITY, FIDELITY, AND EQUAL OPPORTUNITY TO ALL PARTIES. YOU HAVE NOT DONE THAT. . . YOU HAVE SHOWN DISTINCT PARTISANSHIP ON THE SIDE OF THE ACCUSER, YOU HAVE IGNORED THE ACCUSED. THAT'S TOTAL BS.

(AR at 958.) (first ellipses in original).  Later in the Facebook post, Mr. Jones also asserted: "[N]othing in my posts are threats . . . I posted the truth.  I confessed some sins, and DLA has decided to crucify me anyway."  (AR at 958.)  The Assessment classified this post as "indicative of an apparent obsession with a supervisor, coworker or employee grievance," and "also indicative of the pre-violence indicators of constant anger, litigious activities, and allegations of persecution or prejudicial treatment."  (AR at 958.)

In conclusion, after "examin[ing] the nature and context of [Mr. Jones's] exhibited threatening behavior, the potential target(s) of the threats, motivations for [Mr. Jones] having made the threats[,] and his ability to carry out any/all threats[,]" the Threat Assessment found that Mr. Jones posed "a MODERATE RISK of engaging in workplace violence or some other activity/behavior that is contrary to good order and discipline at DSCR." (AR at 960.)  The Assessment noted that "the lack of definitive information regarding [Mr. Jones's] access to firearms or other dangerous weapons [was] the primary factor preventing this assessment from being rated with a greater degree of associated risk (HIGH)."  (AR at 960.)

Mr. Bartlett then prepared a "Barment Package," dated November 26, 2018, comprised of the Threat Assessment, a Staff Summary Sheet (containing a summary of the proposed debarment and signature block), a proposed Bar Letter for Brigadier General Linda Hurry to sign, a copy of the letter placing Mr. Jones on administrative leave, and a copy of Mr. Jones's resignation letter.  (AR 953–66.)  The Barment Package was then reviewed and signed by DLA's

11

Chief of Security and Emergency Services, DSCR's Installation Site Director, and DLA's Associate Counsel. (AR at 963, 949.) The Barment Package is dated November 26, 2018. (AR at 953).

### 3.    Mr. Jones's Barment Letter and Resulting Debarment

On November 29, 2018, Brigadier General Linda Hurry, Commander for DLA Aviation, signed the barment letter and debarred Mr. Jones from the DSCR installation, effective immediately and until further notice.[12] (AR at 888.) In the barment letter, Brigadier General Hurry specified that DLA was taking this action because Mr. Jones "pose[d] a risk to agency personnel" based on a finding that he "exhibited threatening behavior towards other DLA employees and . . . violated a no-contact order established between [Mr. Jones] and a DLA employee." (AR at 888.) She explained that because "[s]uch actions are in violation of DLA policy and are contrary to the maintenance of good order and discipline," Mr. Jones was prohibited from reentering the DSCR installation. (AR at 888.) The barment letter did not list any statute, law, or regulation that Mr. Jones had violated, nor did it reference any specifics dates, events, or people involved. (AR at 888.) The letter advised that should Mr. Jones believe there was a "compelling reason" that justified modification or termination of the debarment, he could submit his justification to Guy Simmons, the DSCR Chief of Security. (AR at 888.)

### B.    Administrative and Procedural History

#### 1.    Mr. Jones's DLA Equal Employment Opportunity (EEO) Proceeding

On December 4, 2018, Mr. Jones initiated contact with DLA's Equal Employment Opportunity (the "EEO") Office. (AR at 28.) On March 12, 2019, he filed his mixed case

---

[12] No dispute exists that Brigadier General Hurry debarred Mr. Jones, however, Mr. Jones disputes the legality of Hurry's decision.

Formal Complaint of Discrimination in the Federal Government (the "EEO Complaint") with

DLA's EEO Office (Case No. DLAR-10-0036).  (AR at 29, 42.)  In his EEO Complaint, Mr.

Jones raised claims of reprisal, gender discrimination, and due process violations based on the

following alleged actions:  (1) placement on telework; (2) management's issuance of two no-

contact orders; (3) denial of a request for a formal hearing before DLA in October 2018 to "clear

[his] name;" (4) segregation from regular coworkers and reassignment of work duties; (5)

placement on administrative leave, and, (6) the November 29, 2018 letter banning him from

entering DSCR.  (AR at 31–37.)  He explained that he was "claiming gender and reprisal because

of the way that the Agency treated [him] after [he] filed [his] sworn statement on [September 14,

2018] at the DLA Police Headquarters against Seiling."  (AR at 31.)  Mr. Jones further asserted

that he "belie[ves] that the Agency colluded with Seiling in order to constructively terminate

[him] from [his] position."  (AR at 32.)  Additionally, he submitted that he claims gender

discrimination "because there [were] some allegations that the Agency has tried to pin on [him]

regarding [his] ability to work with women . . . . and because the Agency treated [him] very

differently than the Agency treated [Ms.] Seiling."  (AR at 32.)

     In October 2019, the Agency completed its investigation of the EEO Complaint, and in

early November 2019, the Agency submitted its report of investigation to Mr. Jones.  The

investigative file, which numbered more than 800 pages, included testimony and documentary

evidence from Mr. Jones, DLA management, and other witnesses.  (AR at 824–56.)

### 2.    Mr. Jones's Merit Systems Protection Board (MSPB) Proceedings

     On January 2, 2020, Mr. Jones timely initiated a Merit Systems Protection Board

("MSPB") case regarding his EEO Complaint because the Agency failed to issue a Final Agency

Decision within 120 days of its filing (Case No. DC-0752-20-0273-1-1) ("MSPB Case I").  (AR

at 967–73.)  In this MSPB case, Mr. Jones asserted involuntary resignation and due process violation claims based on the same facts alleged in his EEO Complaint as well as the alleged mishandling of his EEO complaint.  (AR at 967, 971.)

On March 4, 2020, MSPB Administrative Judge Michelle Hudson issued an Initial Decision on Mr. Jones's MSPB case.  (AR at 1188–1213.)  Specifically, Administrative Judge Hudson dismissed Mr. Jones's case for lack of jurisdiction, finding that Mr. Jones had failed to non-frivolously allege facts supporting a finding that his decision to resign was involuntary.  (AR at 1196–1203.)  She reasoned that because Mr. Jones failed to allege a serious personnel action (because his resignation was deemed voluntary), the MSPB did not have jurisdiction to consider Mr. Jones's other claims.  (AR at 1202.)

On March 9, 2020, Mr. Jones appealed the Administrative Judge Hudson's Initial Decision by timely filing a Petition for Review ("PFR") with MSPB's three-member Board. (AR at 1217–37.)  The Board deferred a decision on Mr. Jones's claim due to the lack of a quorum.  (AR at 1238.)  While the Board reached a quorum in March 2022, Mr. Jones's PFR remained pending at the time of all briefing pertaining to the instant Motion to Dismiss.  (ECF No. 42, at 5.)[13]

### 3.    Freedom of Information Act (FOIA) Requests[14]

DLA has record of three FOIA requests made by Mr. Jones.  On December 12, 2018, Mr. Jones submitted the first two requests.  (ECF No. 42-1, at 2.)  The first two requests pertained to

---

[13] Mr. Jones does not appeal his MSPB case.  The Court, however, provides this history to provide a fulsome procedural background.

[14] Lewis Oleinick, Chief Privacy Officer and FOIA Public Liaison for DLA, submitted a declaration based on his personal knowledge and pursuant to 28 U.S.C. § 1746.  (ECF No. 42-1.) The following information comes from his sworn Declaration.  (ECF No. 42-1.)

emails and Skype communication between Ms. Seiling and Mr. Jones dated after February 1, 2016, as well as emails and Skype communications between Ms. Seiling, Ms. Morasco, and Jeffery Wilson, dated between June 2018 and December 2018. (ECF No. 42-1, at 2.) On February 7, 2019, Mr. Jones requested a "[c]opy of the Final Report of the Command-Directed Investigation [CDI] requested by Teresa W. Smith IRT allegations by David Jones and Natalie Seiling." (ECF No. 42-1, at 3.)

In response to the third request, the CDI was located and reviewed, and portions were withheld under FOIA Exemptions (b)(5), (b)(6), and (b)(7)(C). (ECF No. 42-1, at 3.) DLA provided Mr. Jones the partially withheld records on August 7, 2019. (ECF No. 42-1, at 3.) On August 8, 2019, DLA notified Mr. Jones that, in response to his first two FOIA requests, it found no agency "records" as the term is defined by the FOIA and relevant case law. (ECF No. 42-1, at 2.) Mr. Jones did not appeal any of the responses he received. (ECF No. 42-1, at 3.)

An attorney, Noel Brooks, submitted twelve FOIA requests between September 16, and September 17, 2019, for personal information pertaining to Mr. Jones, Ms. Seiling, and others. (ECF No. 42-1, at 3.) Because the information requested was subject to the Privacy Act of 1974, DLA asked Mr. Brooks to provide either a signed release or documentation demonstrating that he had been retained by one of the parties to act as their attorney. (ECF No. 42-1, at 3.) Mr. Brooks did not provide either so the twelve FOIA requests were closed on October 21, and October 23, 2019. (ECF No. 42-1, at 3.) DLA did not receive any appeals for the responses provided to Mr. Brooks. (ECF No. 42-1, at 3.)

None of the requests submitted by Mr. Jones or Mr. Brooks sought records pertaining to DLA's debarment procedures or records regarding DLA's policies or procedures to bar an individual from access to a DLA facility. (ECF No. 42-1, at 3.)

### 4.   Mr. Jones's Case Pending Before This Federal District Court

On May 3, 2021, Mr. Jones filed his *pro se* Complaint against DLA in the instant matter. (ECF No. 1.)  On June 29, 2021, after this Court granted him leave to amend, Mr. Jones filed an Amended Complaint.  (ECF Nos. 8, 9.)  In his Amended Complaint, Mr. Jones presented an extended narrative that mentioned events and laws that, because of the discursive presentation, did not tie the facts to the law in a manner that established a discernible set of claims.  The United States sought dismissal of the Amended Complaint on two occasions:  once as a Motion to Dismiss or, in the alternative, Motion for Summary Judgment, (ECF Nos. 10, 11), and later as a Second Motion to Dismiss, (ECF Nos. 24, 25).  Both attempts presented evidentiary issues that prevented this Court from ruling on the merits.  On January 3, 2023, the Court ordered Mr. Jones to file a Second Amended Complaint.  (ECF No. 37.)

In his Second Amended Complaint, Mr. Jones, for the first time, identifies twelve individual DLA employees who he attempts to name as defendants: Major General Linda Hurry, Teresa Smith, Thomas Meyer, John Wait, Jean Parrish, Natalie Seiling, Jennifer Morasco, Jessica Ramsaran, Kenyatta McLeod-Poole, Katherine Yourth, Spencer Shaffer, and Guy Simmons.  (ECF No. 38, at 2-3.)  For reasons the Court explains below, the Court will construe his Second Amended Complaint as brought against solely DLA.

Mr. Jones's Second Amended Complaint lacks clarity and precision and fails to delineate specific causes of action.  However, both the Supreme Court of the United States and the United States Court of Appeals for the Fourth Circuit instruct courts to afford *pro se* filings a liberal construction when reviewing pleadings.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Noble v. Burnett*, 24 F.3d 582, 587 n.6 (4th Cir. 1994).  Noting that this is Mr. Jones's third attempt to articulate viable claims, the Court will proceed with its analysis.

16

Keeping these principles in mind, the Court liberally construes Mr. Jones's Second

Amended Complaint to assert the following claims:

    1) Violations of the Fourth,[15] Fifth,[16] Sixth,[17] and Fourteenth[18] Amendments of the United States Constitution ("Constitutional Claims" or "Constitutional Violations");

---

[15] The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[16] The Fifth Amendment provides, in relevant part, that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

[17] The Sixth Amendment states:

In all *criminal* prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. amend. VI. (emphasis added).

[18] The Fourteenth Amendment provides, in relevant part that:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

2) Violation of the Administrative Procedure Act ("APA") by Arbitrarily and Capriciously Imposing Debarment; 5 U.S.C. § 702[19] ("APA Claim" or "APA Violations");

3) Violations of the Freedom of Information Act (FOIA), 5 U.S.C. § 552[20] ("FOIA Claim" or "FOIA Violations");

4) Unauthorized Disclosure[21] and Denial of Access[22] Violations under the Privacy Act of 1974, 5 U.S.C. § 552a ("Privacy Act Claims" or "Privacy Act Violations");

5) Violations of the administrative and procedural aspects of Title 29 CFR,[23] 5 U.S.C. § 6329b ("Investigative Leave Provisions"),[24] 32 CFR § 2004 ("National Industrial Security Program"),[25] and PL 111-292 ("Telework Enhancement Act") (together, the "Administrative Claims" or "Administrative Violations").[26]

---

[19] The APA provides in relevant part that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

[20] In enacting FOIA, Congress sought to "open agency action to the light of public scrutiny" by requiring agencies to adhere to "a general philosophy of full agency disclosure." *Department of Air Force v. Rose,* 425 U.S. 352, 360 (1976). To that end, FOIA commands each agency to "promptly [make] available," upon request, all agency records that do not fall within certain statutory exceptions. 5 U.S.C. § 552(a)(3)(A).

[21] The Privacy Act prohibits federal agencies from disclosing their records to any person or to another agency and provides a private cause of action for an individual who has suffered an adverse effect as the result of a disclosure in violation of the Act.

[22] A plaintiff may bring a Privacy Act claim against an agency if the agency "refuses to comply with an individual request [for his personnel record]." *See* § 552a(g)(1)(B).

[23] Title 29 of the Code of Federal Regulations contains the codified federal laws and regulations pertaining to labor, including employment, wages, and mediation. *See* 29 CFR.

[24] Section 6329b of Title 5 of the United States Code pertains to investigative leave and notice leave for government employees. *See* 5 U.S.C. § 6329b.

[25] Section 2004 of Title 32 of the Code of Federal Regulations "sets out the National Security Program . . . governing the protection of agency classified information released to Federal contractors, licensees, grantees, and certificate holders." 32 CFR § 2004.1

[26] PL 11-292 is an "Act [t]o require the head of each executive agency to establish and implement a policy under which employees shall be authorized to telework, and for other purposes." PL 111-292.

(ECF No. 38.)

DLA moved the Court to dismiss, or in the alternative, enter summary judgment in its favor. (ECF No. 41.)  Mr. Jones responded in opposition, (ECF No. 43), and DLA replied, (ECF No. 44).

As relief, Jones seeks "revocation of the debarment;" "reinstatement of his employment at the DSCR as a GS-1515;" "fully-successful annual evaluations placed in his official personnel file;" "restoration of all accrued annual and sick leave;" "back pay with appropriate annual raises and interest;" "[a] permanent, formal letter of reprimand, signed by the Presiding Judge, placed permanently in [Brigadier General] Hurry's Official Military Personnel File," and monetary damages. (ECF No. 38, at 30–31.)

Monetarily, Mr. Jones seeks $25,000 in damages for "public humiliation" due to violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights as well as for FOIA and Privacy Act violations. (ECF No. 38, at 30–31.)  For the alleged violation of PL 11-292 and telework policies, Mr. Jones demands $25,000 in damages. (ECF No. 38, at 31.)  For the no contact order, the investigation of Jones after he "[became] a private citizen," defamation, and the violation of his Fifth, Sixth, and Fourteenth Amendment Rights through the Threat Assessment, Mr. Jones demands $100,000 in damages. (ECF No. 38, at 31.)

On March 29, 2023, Mr. Jones filed a sur-reply entitled Plaintiff's Response to Defendant's Memorandum in Support of Defendant's Motion to Dismiss (the "Sur-Reply"). (ECF No. 46.)  On April 6, 2023, DLA filed a Motion to Strike the Sur-Reply. (ECF No. 48.)  Although Mr. Jones filed his Sur-Reply without seeking leave of Court which is a violation of

Local Rule 7(F)(1),[27] the Court will deny DLA's motion to strike. (ECF No. 48.) The Court does so because it evaluates some of these claims under a summary judgment standard, and considering this document allows Mr. Jones the maximum opportunity to respond to this Motion. However, the Court notes that Mr. Jones already raises the contentions in his Sur-Reply, in his Second Amended Complaint, (ECF No. 38), and in his Opposition, (ECF No. 43).

## II.  Standards of Review

### A.      Rule 12(b)(1)

In a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(1) challenging the Court's subject-matter jurisdiction, the burden rests with the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *See Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). A motion to dismiss pursuant to FRCP 12(b)(1) can attack subject-matter jurisdiction in two ways. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams*, 697 F.2d at 1219). First, a Rule 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject-matter jurisdiction can lie.

---

[27] Local Rule 7(F)(1) provides, in pertinent part:

"All motions . . . shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies. Unless otherwise directed by the Court, the opposing party shall file a response brief and such supporting documents as are appropriate, within fourteen (14) calendar days after service and the moving party may file a reply brief within six (6) calendar days after the service of the opposing party's response brief. . . . *No further briefs or written communications may be filed without first obtaining leave of Court.*

E.D. Va. Loc. Civ. R. 7(F)(1) (emphasis added).

*See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *Adams*, 697 F.2d at 1219).  "When a defendant makes a facial challenge to subject matter jurisdiction, 'the plaintiff, in effect, is afforded the same procedural protection as he [or she] would receive under a Rule 12(b)(6) consideration.'"  *Kerns*, 585 F.3d at 192 (quoting *Adams*, 697 F.2d at 1219).  In such a challenge, a court assumes the truth of the facts alleged by plaintiff.  *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *Adams*, 697 F.2d at 1219).

Alternatively, a Rule 12(b)(1) motion may also challenge the existence of subject-matter jurisdiction in fact, apart from the pleadings.  *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams*, 697 F.2d at 1219); *see also Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *Adams*, 697 F.2d at 1219).  In such a case, because a party challenges the court's "'very power to hear the case' . . . the trial court is free to weigh the evidence to determine the existence of its jurisdiction."  *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  "'[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'"  *Id.* (quoting *Mortensen*, 549 F.2d at 891); *see also Adams*, 697 F.2d at 1219.

**B.      Rule 12(b)(6)**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual

information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir.2011)). This principle applies only to factual allegations; however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed." *Witthohn*, 164 F. App'x at 396–97 (citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Gasner v. Cty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995)).

## C.   Rule 56 and the Administrative Procedure Act

The APA affords a right of judicial review of final agency action. *See* 5 U.S.C. § 702.[28] "Section 10 of the APA establishes that, as a general rule, 'agency action, findings, and conclusions' will be set aside only when they are 'found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ohio Valley Env't Coal. v. Aracoma*

---

[28] The APA states, in pertinent part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

*Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting 5 U.S.C. § 706(2)). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Id.*

The standard of review "is narrow and a court is not to substitute its judgment for that of the agency." *Friends of Back Bay v. U.S. Army Corps of Engineers*, No. 2:10cv270, 2011 WL 12473234, at *5 (E.D. Va. Feb. 9, 2011) (citation omitted). The reviewing court "does not resolve factual questions, but instead determines 'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* at *4 (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)) (quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)).

Accordingly, "the ordinary summary judgment standard under Rule 56(c) . . . does not apply." *Hyatt v. U.S. Patent and Trademark Office*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015). "Rather, in an APA agency review case, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA.'" *Id.* (quoting *Sierra Club*, 459 F. Supp. 2d at 90). Therefore, "the focal point for judicial review should be the administrative record already in existence." *Sanitary Bd. of Charleston v. Wheeler*, 918 F.3d 324, 334 (4th Cir. 2019) (citation omitted). As a result, federal courts should "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* at 333 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)).

In making its determination, a reviewing court must ensure that the agency has "examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Ohio Valley Env't Coal.*, 556 F.3d at

192 (internal quotation marks and citation omitted).  The court reviews an agency's factual conclusions under the substantial evidence standard which allows the court to overturn only final agency decisions that are "unsupported by substantial evidence in a case . . . reviewed on the record."  5 U.S.C. § 706(2)(E).  The Supreme Court of the United States has "defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" which is "something less than the weight of the evidence."  *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619–20 (1966) (citation omitted).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Id.* at 620.

In applying the substantial evidence standard, the reviewing court's task "is not to reweigh the evidence and determine which of the competing views is more compelling."  *Gonahasa v. I.N.S.*, 181 F.3d 538, 542 (4th Cir. 1999).  The court may not "substitute its views for that of the [a]gency."  *Perez v. Cissna*, 914 F.3d 846, 856 (4th Cir. 2019), *reversed on banc on other grounds*, *Perez v. Cuccinelli*, 949 F.3d 865 (4th Cir. 2020).  Instead, the court must simply "ensure that substantial evidence supports the [agency's] judgment."  *Gonahasa*, 181 F.3d at 542.  Nevertheless, if the grounds on which the agency relied "are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Courts generally afford substantial deference to an agency's interpretation of both a statute it administers and its own implementing regulations.  *See, e.g.*, *Ohio Valley Env't Coal.*, 556 F.3d at 192.  However, the court owes no such deference to an agency's interpretation of its own regulation when "instead of using its expertise and experience to formulate a regulation, it

has elected merely to paraphrase the statutory language." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006); *see also Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1136 (D.C. Cir. 2014), *remanded to* 211 F. Supp. 3d 31 (D.D.C. 2016) (when an agency's regulation "parrots, rather than interprets, the key statutory language," the court obliges the agency language no deference). Where "the underlying regulation does little more than restate the terms of the statute itself," the agency has not supplemented Congress's text and thereby has not provided agency interpretation to which a court might defer. *Id.* at 1135 (citation omitted).

### D. Obligation to Construe *Pro Se* Pleadings Liberally

Because Mr. Jones proceeds *pro se* in this case, the Court liberally construes his filings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers" (internal quotation marks and citations omitted)). Nonetheless, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleading to allege facts that set forth a claim cognizable in a federal district court. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (outlining pleading requirements under Federal Rule of Civil Procedure 8 for "all civil actions"). A *pro se* plaintiff litigant must allege facts sufficient to state a cause of action. *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999) (citation omitted). The Court cannot act as a *pro se* litigant's "advocate and develop, *sua sponte*, statutory and constitutional claims that the [litigant] failed to clearly raise on the face of [the] complaint." *Newkirk v. Cir. Ct. of Hampton*, No. 3:14cv372, 2014 WL 4072212, at *1 (E.D. Va. Aug. 14, 2014) (citations omitted).

### III.  Analysis

Mr. Jones has filed suit *pro se* against his former employer, DLA, and twelve individual

federal employees for violations that he alleges occurred during his employment with DLA and

debarment from the installation.  He alleges (1) constitutional; (2) APA; (3) FOIA; (4) Privacy

Act; and (5) administrative claims.  Defendants move the Court to dismiss, or in the alternative,

enter summary judgment against Mr. Jones.

As a preliminary matter, the Court must address the twelve individual DLA employees

Mr. Jones attempts to name as defendants.  Because the Court does not have jurisdiction over the

non-constitutional and constitutional claims that Mr. Jones attempts to bring against individual

employees, the Court will dismiss the claims against them.

The Court will dismiss Count 1 (the Constitutional Claims), 4 (the Privacy Act Claim),

and 5 (the Administrative Claims).  Count 1 will be dismissed because it is barred by sovereign

immunity.  Counts 4 and 5 will be dismissed because Jones fails to plead plausible claims.

As to Counts 2 (the APA Claim) and 3 (the FOIA Claim), the Court will grant the

Government's motion for summary judgment because, even drawing all inferences in favor of

Mr. Jones, the Court concludes that Mr. Jones's arguments cannot prevail.

### A.    The Court Will Dismiss the Individual Defendants and Construe Mr. Jones's Claims as Brought Against DLA

In his Second Amended Complaint, Mr. Jones, for the first time, identifies twelve

individual DLA employees who he attempts to name as defendants:  Major General Linda Hurry,

Teresa Smith, Thomas Meyer, John Wait, Jean Parrish, Natalie Seiling, Jennifer Morasco,

Jessica Ramsaran, Kenyatta McLeod-Poole, Katherine Yourth, Spencer Shaffer, and Guy

Simmons.  (ECF No. 38, at 1-2.)  For the reasons that follow, the allegations against these

individuals, even read liberally and accepted as true, cannot survive the motion to dismiss.

To the extent Mr. Jones seeks to bring the non-constitutional claims against the individuals, they must be dismissed because they are not properly before this Court. First, the individuals have not been served in their individual capacities. "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).

Second, had they been served, the individual employees are not proper defendants for the non-constitutional claims asserted. As to the FOIA and Privacy Act claims, the only proper defendant is the head of the department or agency, or the agency itself. *Wheeler v. Gilmore*, 998 F. Supp. 666, 668 ("as the [Privacy] Act makes clear, an agency is the only proper defendant under the Act and, therefore, individuals may not be named as defendants in such actions"); *Ginarte v. Mueller*, 534 F. Supp.2d 135, 137-38 (D.D.C. 2008) ("It is well established by now that individual federal employees are not subject to suit under FOIA. . . . The only proper defendant in a FOIA case is a federal agency." (internal citations omitted)).[29] Accordingly, as to the non-constitutional claims, the individual defendants must be dismissed because they have not been served in their individual capacities and they are not proper defendants in the action.

Finally, to the extent Mr. Jones is attempting to assert constitutional claims against the newly named individuals, the claims are untimely. So-called *Bivens*[30] claims, which are lawsuits for damages from a federal officer who, acting under color of federal law, violates certain

---

[29] In Count 5, Mr. Jones also purports to raise claims pursuant to 29 CFR, 5 U.S.C. § 6329b, 32 CFR § 2004, and PL 111-292 (the "Administrative Violations"). However, the Court is unable to discern the defendants at issue because, as is later explained, Mr. Jones fails to comply with the federal pleading standards set forth in Fed. R. Civ. P. 8. The Court cannot, even reading favorably, construe the administrative claims and the grounds upon which they rest.

[30] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

constitutional rights, are subject to a two-year statute of limitations under VA. Code Ann. § 8.01-243(A).  Because there is no explicit statute of limitations for *Bivens*, the courts borrow the personal injury statute of limitations from the relevant state.  *See Reinbold v. Evers*, 187 F.3d 348, 359 n.10 (4th Cir.1999) (*citing Wilson v. Garcia*, 471 U.S. 261, 266–70 (1985)).  Virginia applies a two-year statute of limitations to personal injury claims.  *See* Va. Code Ann. § 8.01–243(A).  The alleged constitutional violations took place between September 14, 2018, and December 5, 2018.  (ECF No. 38, at 5–10.)  The Second Amended Complaint—which was the first to name any individual defendant—was filed on January 26, 2023, more than four years later.  (ECF No. 38.)  Even his initial Complaint, filed on May 3, 2021, fell beyond the statute of limitations.  (ECF No. 1.)  Because Mr. Jones did not timely file his action against the individual employees, his *Bivens* claims against the individual Defendants, to the extent they are asserted, will be dismissed.

Because the Court does not have jurisdiction over the non-constitutional and constitutional claims that Mr. Jones attempts to bring against individual employees, the Court will grant the Motion to Dismiss as it pertains to them.  In deference to Mr. Jones's *pro se* status, the Court will liberally read his Second Amended Complaint as bringing claims against the DLA.

### B.  The Court Will Dismiss Mr. Jones's Constitutional Claims Against DLA in Count 1 Because They Are Barred by Sovereign Immunity

In Count 1, Mr. Jones contends that DLA violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.  However, these claims must be dismissed as barred by sovereign immunity.

The principle of sovereign immunity prohibits individuals from suing the United States or its agencies without their consent.  *See FDIC v. Meyer*, 510 U.S. 471, 484–86 (1994).  "Absent a

waiver, sovereign immunity shields the Federal Government and its agencies from suit . . . .

Sovereign immunity is jurisdictional in nature.  Indeed, the terms of [the United States'] consent

to be sued in any court define that court's jurisdiction to entertain the suit."  *Id.* at 475 (internal

citations and quotation marks omitted); *United States v. Mitchell,* 463 U.S. 206, 212 (1983) ("It

is axiomatic that the United States may not be sued without its consent and that the existence of

consent is a prerequisite for jurisdiction.").  The United States and its agencies are absolutely

immune from suit except as Congress specifically provides, and any waivers of immunity are to

be strictly construed.  *Radin v. United States,* 699 F.2d 681, 684–86 (4th Cir. 1983) (holding

sovereign immunity barred claim against the National Mediation Board, a federal agency based

on allegations of Fifth Amendment due process violation); *see Reinbold v. Evers,* 187 F.3d 348,

355 n.7 (4th Cir.1999) ("the United States has not waived sovereign immunity in suits claiming

constitutional torts"); *Randall v. United States,* 95 F.3d 339, 345 (4th Cir.1996) ("*Bivens* did not

abolish the doctrine of sovereign immunity of the United States.  Any remedy under *Bivens* is

against federal officials individually, not the federal government.").[31]  Additionally, in suits

where the federal government is named as the defendant, "it is the plaintiff's burden to show that

an unequivocal waiver of sovereign immunity exists."  *Welch v. United States,* 409 F.3d 646, 651

---

[31]  The Tucker Act—consisting of the so-called "Little Tucker Act" and the "Big Tucker Act"—provides a basis for waiving sovereign immunity.  The Little Tucker Act permits a district court to exercise jurisdiction over non-tort claims against the United States for money judgments not exceeding $10,000.  28 U.S.C. § 1346(a)(2); *Harrison v. U.S. Social Sec. Admin.*, No. 3:13cv435, 2014 WL 29042, at *3 (E.D.Va. Jan. 2, 2014).  "For these claims, district courts have concurrent jurisdiction with the Court of Federal Claims."  *Id*; *see also* 28 U.S.C. § 1346(a)(2).  When a plaintiff claims more than $10,000 in damages, however, the Big Tucker Act grants the Court of Federal Claims exclusive jurisdiction over those non-tort money claims against the United States.  28 U.S.C. § 1491; *Harrison,* 2014 WL 29042, at *3 (distinguishing Little and Big Tucker Acts).

Here, because all claims for damages exceed $10,000, concurrent jurisdiction under the Little Tucker Act does not exist.  Even if Mr. Jones could plausibly allege a Big Tucker Act claim, it would have to go before the Court of Federal Claims.

(4th Cir. 2005). Even reading his allegations liberally and accepting them as true, Jones has not plausibly shown any waiver even in his third attempt. Therefore, any constitutional claims asserted by Mr. Jones against DLA in Count 1 will be dismissed.

### C.   DLA's Debarment of Mr. Jones Was Not Arbitrary or Capricious Because It Followed DoD and DLA Policy and Because Substantial Evidence Supports the Finding That Mr. Jones's Actions Were Contrary to the Maintenance of Good Order and Discipline at DSCR

The Court evaluates Count 2 (the APA Claim), as well as Count 3 (the FOIA Claim) under the lens of summary judgment because matters outside the pleadings are presented to and not excluded by the Court.

In Count 2 of his Second Amended Complaint, Mr. Jones asserts that DLA arbitrarily and capriciously debarred him in violation of the APA. While Mr. Jones contends that DLA's determination to bar him from entering the installation was "arbitrary, capricious, and without legal authority," (ECF No. 38, at 16), the record shows, even viewed favorably toward Mr. Jones, that DLA followed DoD and DLA protocol and that Mr. Jones's actions were contrary to the maintenance of good order and discipline at DSCR. As such, the Court will grant the Motion for Summary Judgment against Mr. Jones in Count Two.

### 1.   Legal Standard: United States District Court Jurisdiction When Reviewing Final Agency Action

When reviewing final agency action, this Court's review is circumscribed under 5 U.S.C. § 702. "Section 10 of the APA establishes that, as a general rule, 'agency action, findings, and conclusions' will be set aside only when they are 'found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ohio Valley Entvl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)). "Review under this

standard is highly deferential, with a presumption in favor of finding the agency action valid."
*Id.*

The standard of review "is narrow and a court is not to substitute its judgment for that of
the agency." *Friends of Back Bay v. U.S. Army Corps of Engineers*, No. 2:10cv270, 2011 WL
12473234, at *5 (E.D. Va. Feb. 9, 2011) (citation omitted). The reviewing court "does not
resolve factual questions, but instead determines 'whether or not as a matter of law the evidence
in the administrative record permitted the agency to make the decision it did.'" *Id.* at *4 (citing
*Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)) (quoting *Occidental Eng'g Co.
v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)); *see also Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d
1324, 1335 (4th Cir. 1995) ("[j]udicial review of administrative action is generally confined to
the administrative record.")

In addition, in *Cafeteria Workers,* the Supreme Court reaffirmed "the historically
unquestioned power of a commanding officer summarily to exclude civilians from the area of
[his or her] command." *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886,
893 (1961). The Supreme Court explained that this power is constitutional in origin, deriving
from Congress's power to regulate the Army and Navy, and the President's authority as
Commander in Chief. *Id.* at 890 (citing U.S. Const. art. I, § 8; id. art. II, § 2). It is limited by the
requirement that the commanding officer not rely on grounds that are patently arbitrary or
discriminatory. *Id.* at 897-98.

### 2.  DLA's Debarment of Mr. Jones Was Not Arbitrary or Capricious Because It Followed DLA Protocol

The Secretary of Defense has promulgated policy instructions to assist commanders in
maintaining safety and order on installations. Relevant here, Department of Defense Instruction
(DoDI) 5200.08 establishes the "authority of a DoD commander to take reasonably necessary

and lawful measures to maintain law and order and to protect installation personnel and property : . . . [including] the removal from, or the denial of access to, an installation or site of individuals who threaten the orderly administration of the installation or site." U.S. Dep't of Def., Instr 5200.08, Security of DoD Installations and Resources and the DoD Physical Security Review Board (PSRB), ¶¶ 3.2–3.2.2 (2005).[32]  It also "permits prohibiting individuals from reentering an installation after they have been removed and ordered not to reenter." *Id.* at ¶ 3.2.4.  DoDI 5200.08 further provides that removals or denial actions "[s]hall not be exercised in an arbitrary, unpredictable, or discriminatory manner[,] . . . must be based on reasonable grounds[,] and [must] be judiciously applied." *Id.* at ¶ 3.2.3.

DLA, along with applying the policy outlined in DoDI 5200.08, follows additional protocols for debarment procedures.  Memorandum for Director, DLA Installation Support, DLA Policy on Authority of DLA Police to Detain and Bar Civilians from Installation, July 10, 2013. (ECF No. 42–3, at 67.)  In particular, DLA policy provides that a debarment may be initiated "for any criminal offense or disorder that adversely affects good order and discipline." (ECF No. 42–3, at 75.)  DLA policy further states that "[t]he recommendation to bar an individual should be based on the totality of the circumstances . . . along with all supporting documentation, and a letter appropriate to the action recommended will be coordinated with the servicing Office of Counsel." (ECF No. 42–3, at 75.)  If the recommendation and supporting documentation is found to be legally sufficient, the installation commander will then approve or disapprove the bar letter and return the action to the DLA police. (ECF No. 42–3, at 75.)

---

[32] Publicly available at
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/520008p.pdf?ver=2019-04-22-104600-590 (last accessed September 1, 2023).

Here, DLA followed DoD and DLA policy.  On November 26, 2018, Don Bartlett, a DLA Criminal Intelligence Analyst, prepared a Threat Assessment Memorandum assessing the potential risks Mr. Jones posed to the installation and its employees.  The Threat Assessment evaluated several of Mr. Jones's emails, interactions, and social media posts, and found that they were indicative of "grievance building," "allegations of persecution or prejudicial treatment," "apparent obsession with a supervisor, co-worker or employee grievance," "constant anger," "controlling behavior," and "vindictive references," all of which were "common pre-violence indicators exhibited by those who have committed workplace violence, active shooter, or mass-casualty attacks."  (AR at 953–61.)

In conclusion, after examining "the nature and context of [Mr. Jones's] exhibited threatening behavior, the potential target(s) of the threats, motivations for [Mr. Jones] having made the threats[,] and his ability to carry out any/all threats," the Threat Assessment found that Mr. Jones posed "a MODERATE RISK of engaging in workplace violence or some other activity/behavior that is contrary to good order and discipline at DSCR."  (AR at 960.)  The Assessment noted that "the lack of definitive information regarding [Mr. Jones's] access to firearms or other dangerous weapons [was] the primary factor preventing this assessment from being rated with a greater degree of associated risk (HIGH)."  (AR at 960.)

Mr. Bartlett then prepared a "barment package" comprised of the Threat Assessment, a Staff Summary Sheet (containing a summary of the proposed barment and signature blocks), a proposed Bar Letter for Brigadier General Hurry to sign, a copy of the letter placing Mr. Jones on administrative leave, and a copy of Mr. Jones's resignation letter.  (AR 953–966.)

DLA's Chief of Security and Emergency Services, DSCR's Installation Site Director, and DLA's Associate Counsel then reviewed and signed the barment package.  (AR at 963, 949.)  On

November 29, 2018, Brigadier General Linda Hurry signed the barment letter and debarred

Plaintiff from the DSCR installation, effective immediately and until further notice. (AR at 888.)

### 3. Mr. Jones's Actions Were Contrary to the Maintenance of Good Order and Discipline at DSCR

The evidence does not support Mr. Jones's contention that DLA's determination to bar

him from entering DSCR was arbitrary and capricious. Rather, even viewed in the proper light,

substantial evidence supports DLA's decision to bar Mr. Jones because his actions were contrary

to the maintenance of good order and discipline at DSCR.

On September 13, 2018, approximately two months before Mr. Jones was debarred,

Jennifer Morasco, one of Mr. Jones's DLA co-workers, filed an incident report with DLA police

alleging harassment by Mr. Jones.[33] (AR at 931–32.) Ms. Morasco reported that Mr. Jones

grabbed her arm while he insisted that she intervene on his behalf with another DLA co-worker,

Natalie Seiling. (AR at 931.) Ms. Seiling and Mr. Jones had been involved in a two year "off

and on" extramarital affair that had ended poorly. (AR at 931–32.) Ms. Morasco feared for her

personal safety due to Mr. Jones's "increasingly unpredictable and violent behavior." (AR at

931.) When Mr. Jones wrote a love letter to Ms. Seiling and asked Ms. Morasco to deliver it,

Ms. Morasco instead delivered the letter to her supervisor who then contacted DLA Police. (AR

at 931.)

DLA Police then interviewed Ms. Seiling, who reported that after their relationship ended

in March 2018, Mr. Jones continuously attempted to contact her by email, text, and telephone;

---

[33] Mr. Jones asserts that Ms. Morasco later texted him recanting her allegations against him. (ECF No. 42, at 3.) For the reasons explained in Footnote 6, the Court finds that Mr. Jones concedes the principal fact that Ms. Morasco provided sworn statements alleging harassment to DLA police.

spread "vicious rumors" about her; "embarrassed her to the point that she [did] not want to come

to work;" and sent her suicidal, threatening, and defamatory messages.  (AR at 931.)

The next day, on September 14, 2018, Mr. Jones's supervisor wrote that he was

"requiring [Mr. Jones] to telework next Monday through Friday."[34]  (AR at 211–12.)  On

September 20, 2018, DLA issued two no-contact orders prohibiting Mr. Jones from contacting

either Ms. Seiling or Ms. Morasco.[35]  (AR at 451–52, 606.)  That same day, Chief Data Officer

Teresa Smith filed a Commander Directed Inquiry for an investigation conducted by DLA based

on Ms. Seiling's and Ms. Morasco's complaints of alleged harassment, misconduct, and hostile

work environment.[36]  (AR at 879.)  On September 28, 2018, Ms. Seiling sought a protective

order against Mr. Jones in the Chesterfield General District Court.  (AR at 580–82.)

On October 24, 2018, Mr. Jones, met with an administrative investigator at DSCR and

provided information and evidence in mitigation of Ms. Seiling and Ms. Morasco's allegations.

(AR at 954.)  A decision was made later that day to allow Mr. Jones to return to work at DSCR,

but to assign him to a different directorate so that contact between him, Ms. Seiling, and Ms.

Morasco would be avoided.  (AR at 954.)

---

[34] Mr. Jones attempts to dispute this fact by alleging that Mr. Wait's order to Mr. Jones violated a regulation.  For the reasons explained in Footnote 7, the Court concludes that this fact is immaterial.

[35] Mr. Jones seemingly seeks to dispute this fact by contending that his "signature is not on the document displayed in AR at []606," and that "[t]he unsigned document is not conclusive evidence that the no-contact orders were administered properly."  (ECF No. 43, at 5.)  For the reasons explained in Footnote 8, the Court concludes that this fact is undisputed.

[36] Mr. Jones contends that the United State offers "no documentation that supports this statement, other than the CDI summary dated [February 8, 2019] signed by the apparent investigator."  (ECF No. 43, at 5.)  For the reasons explained in Footnote 9, the Court concludes that any dispute as to this fact is immaterial.

On October 25, 2015, DSCR removed all restrictions regarding Mr. Jones's access.  (AR at 954.)  That day, Mr. Jones sent an email to Chief Data Officer Smith, expressing his feelings of persecution, stating in part, "I have done NOTHING to deserve this treatment[.] . . . I have been vilified, I have been wrongfully labeled[.] . . . I did not have one advocate rooting for me[.] . . . May God have mercy on every party associated with these tragic events." (AR at 954–55.)

The next day, on October 26, 2018, Mr. Jones made several Facebook posts referring to Seiling, excerpts of which include:  "HATING YOU would require an emotional commitment;" "I'm not perfect. I'll annoy you . . . , but you'll never find someone who loves you as much as I do;"  "all the feelings I ever had for you just went that a way [sic], no [sic] go f*** yourself;" I KNOW THAT YOU ARE STALKING ME AND MY PAGE. . . . YOU REMEMBER ONE THING:  YOU ARE NOTHING BUT A DAMN LIAR, AND YOU JUST SCREWED YOUR NARCISSISTIC SELF."  (AR at 955–56.)  The same day, he also posted a video of a burning fire posted with the message:

> FOR THOSE WHO ARE PERPLEXED, THERE IS A SILVER RING IN THE
> FIRE THAT WAS TAKEN FROM MY HOME WITHOUT MY PERMISSION;
> THAT RING WAS RETURNED TO ME . . . CONTAMINATED . . . THE FIRE
> PURGED THE CONTAMINATION . . . I'LL CARRY THIS RING ON A KEY
> CHAIN . . . AS A REMINDER OF THE PERSON WHO TOOK THE RING . . .
> AND THANK GOD THAT THAT PERSON IS NOW SUBJECT TO A FULL
> DAMNATIO MEMORIAE.

(AR at 956.)

On October 26, 2018, Mr. Jones also approached Ms. Seiling in the hallway of the Chesterfield County Small Claims Court where they were both there pursuant to a suit Mr. Jones filed to lawfully reacquire four personal items.  (AR at 956.)  Although DLA had already issued the no contact order, Ms. Seiling alleged that Mr. Jones continually attempted to "forcefully

engage [Ms. Seiling] in conversation," until her attorney intervened, and Ms. Seiling left. (AR at 956.)

Mr. Jones continued to make Facebook posts about Ms. Seiling and the investigation over the next two weeks. On November 14, 2018, Ms. Seiling sent an email with the subject line "Frightened, please help stop this," to various DLA officials stating that she felt threatened by Mr. Jones's recent behavior. (AR at 892.). She attached several of Mr. Jones's recent Facebook posts to the email.[37] (AR at 892-915.)

The same day, on November 14, 2018, DLA placed Mr. Jones on paid administrative leave, effective immediately, pending completion of the Agency's investigation into complaints against him. (AR at 891.) On November 17, 2018, Mr. Jones submitted his resignation to DLA.[38] (AR at 636.)

On November 26, 2018, DLA Criminal Intelligence Analyst Bartlett completed the Threat Assessment. (AR at 953–61.) The Threat Assessment catalogued, described, and evaluated Mr. Jones's emails, Facebook posts, and actions after he was allowed to return to DSCR on October 25, 2018, through two days before his resignation on November 15, 2018.

---

[37] Mr. Jones contends that "an inspection of [the] so-called social media posts reveals that the persons who allegedly downloaded Mr. Jones'[s] alleged social media posts are *not* Seiling." (ECF No. 43, at 7.) However, as explained in Footnote 10, the person who downloaded the Facebook posts is irrelevant to this matter. While Mr. Jones contends that "Seiling has supplied third-party 'evidence' that uniformly fails to meet the standards of the Federal Rules of Evidence," (ECF No. 43, at 7), "[i]n an APA suit challenging agency action, review is limited to the administrative record." *Hyatt v. U.S. Pat. & Trademark Off.*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (quoting *Nw. Motorcycle Ass'n v. U.S. Dept' Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994)).

[38] Mr. Jones asserts that because he resigned on November 17, 2018, DLA's investigation should have immediately ceased. (ECF No. 38, at 18.) However, Mr. Jones offers no support for this assertion. Additionally, the suspension of the investigation, particularly given Mr. Jones's intensifying conduct towards his workplace and coworkers, would have been contrary to the maintenance of good order and discipline at DSCR.

(AR at 953–61.) As previously stated, the Threat Assessment concluded that Mr. Jones's actions were indicative of "grievance building," "allegations of persecution or prejudicial treatment," "apparent obsession with a supervisor, co-worker, or employee grievance," "constant anger," "controlling behavior," and "vindictive references," all of which were "common pre-violence indicators exhibited by those who have committed workplace violence, active shooter, or mass-casualty attacks." (AR at 953–61.)

The administrative record, even viewed in the light most favorable to Mr. Jones and with all inferences running in his favor, contains substantial evidence showing that DLA's decision to debar Jones was not arbitrary or capricious under the APA. The nature and extent of Mr. Jones's grievances against his workplace, together with his increasing anger, threats, and feelings of persecution were well documented in the evidence DLA considered in deciding to bar Mr. Jones. The undisputed fact that his potential target or targets were members of the DSCR workforce further support that DLA's debarment of Mr. Jones was rationally related to the maintenance of good order and discipline on the installation. The Court concludes that, given the totality of the circumstances, substantial evidence demonstrates that the decision to bar Mr. Jones was not arbitrary or capricious. Accordingly, the Court will grant summary judgment as to Mr. Jones's third attempt to articulate an APA challenge in Count 2 of his Second Amended Complaint.

### D. Mr. Jones's FOIA Claim Fails Because He Has Not Shown That a Request for Records Was Properly Made, That the Request Was Denied, and That the Denial Was Improper

The Court also evaluates Count 3 (the FOIA Claim) under the lens of summary judgment because matters outside the pleadings are presented to, and not excluded by, the Court. Specifically, the Court considers the sworn Declaration of Lewis W. Olenick, Chief Privacy

Officer and FOIA Public Liaison for the DLA, which the Government includes as the first exhibit to its Motion.

In Claim 3, Mr. Jones alleges that DLA violated provisions of 5 U.S.C. 552, the Freedom of Information Act, by failing to "publish its debarment procedures." (ECF No. 38, at 12.) However, the Court does not have jurisdiction to review this claim because no record exists that DLA received a FOIA request from Mr. Jones for the debarment procedures. Accordingly, the Court will grant the Government's Motion for Summary Judgment as to the FOIA claim articulated in Claim 3.

### 1.    Legal Standard:  Demonstrating a FOIA Violation

In enacting FOIA, Congress sought to "open agency action to the light of public scrutiny" by requiring agencies to adhere to "a general philosophy of full agency disclosure." *Department of the Air Force v. Rose,* 425 U.S. 352, 360 (1976). To that end, FOIA commands each agency to "promptly [make] available," upon request, all agency records that do not fall within certain statutory exceptions. 5 U.S.C. § 552(a)(3)(A). Further, FOIA confers jurisdiction on district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). To establish this jurisdiction, there must be "a showing that an agency has (1) improperly (2) withheld (3) agency records." *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 150 (1980) (internal quotation marks omitted). Absent such a showing, "a district court lacks jurisdiction to devise remedies to force an agency to comply with FOIA's disclosure requirements." *United States Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 142 (1989).

> **2.    Mr. Jones's FOIA Claim in Count 3 Falters Because He Does Not Show That He Made a Proper Request for the Files and the Request Was Denied**

Mr. Jones alleges that "DLA as an Agency failed to publish its debarment procedures in violation of 5 [U.S.C. 552]," (ECF No. 38, at 12), and that DLA "violated 5 [U.S.C.] 552 by concealing its procedures and preventing employees from being able to obtain any information." (ECF No. 38, at 14-15.)  He further contends that "5 [U.S.C.] 552 requires agencies to publish their policies and procedures electronically on-line."  (ECF No. 38, at 15.)

FOIA confers jurisdiction on the district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B).  To establish this jurisdiction, there must be "a showing that an agency has (1) improperly (2) withheld (3) agency records." *Kissinger*, 445 U.S. at 150 (internal quotation marks omitted).

Here, no record exists that DLA received a FOIA request from Mr. Jones for the debarment procedures.  (ECF No. 42-1, at 3.)  The undisputed record demonstrates that DLA received three FOIA requests from Mr. Jones:  two requests pertained to emails and Skype communication, and one requesting a copy of the final CDI report.  (ECF No. 42-1, at 2-3.) Even viewing favorably undisputed facts and drawing inferences for Mr. Jones, the Court cannot conclude that DLA improperly withheld agency records if no request for records exists.  "Absent a description of the documents sought, as well as details of the refusal to turn over the requested information, it is impossible to determine if [plaintiff] has stated a viable claim." *Carroll v. Soc. Sec. Admin.*, WDQ-11-3005, 2012 WL 1454858, at *2 (D. Md. Apr. 24, 2012); *see also Marshall v. Cuomo*, 192 F.3d 473, 485 (4th Cir. 1999) (affirming dismissal of a FOIA claim where the plaintiff failed to identify the specific documents requested).

Therefore, the Court must grant the Government's motion for summary judgment as to

Mr. Jones's third attempt to state a FOIA cause of action in Claim 3 of this Second Amended

Complaint.

### E.    Mr. Jones's Privacy Act Claims Must Be Dismissed He Fails to Plead Plausible Denial of Access and Unauthorized Disclosure Claims

Reading Claim 4 liberally, Mr. Jones presents two Privacy Act Claims: (1) Unauthorized

Disclosure, and (2) Denial of Access. Neither prevails.[39] As to the Unauthorized Disclosure

claim, Mr. Jones contends that "[a]lthough [he] filed a complaint with the DSCR EEO Office on

[December 5, 2018], the debarment forced [Mr. Jones] to file his complaint via e-mail without a

face-to-face meeting with any EEO counsel . . . which violated 5 USC 552a, since exchanges of

private, sensitive information occurred over unsecure electronic means." (ECF No. 38, at 14.)

Regarding Denial of Access, Mr. Jones asserts that he was told that he "must request a copy [of

the CDI] using DLA's Freedom of Information Act (FOIA) portal, actions which violated 5

[U.S.C.] 552a(d)(1) and (d)(2). Despite this being a record in [Mr. Jones's] personnel file and

subject to the Privacy Act." (ECF No. 38, at 23.) For the reasons that follow, the Court will

dismiss both Privacy Act claims.

### 1.    Legal Standard:  Demonstrating Unauthorized Disclosure Under the Privacy Act

The Privacy Act prohibits federal agencies from disclosing covered records to any person

or to another agency. 5 U.S.C. § 552a(b). It also provides a private cause of action for an

individual who has suffered an adverse effect as the result of a disclosure in violation of the Act.

5 U.S.C. § 552a(g)(1)(D). To establish a Privacy Act unauthorized disclosure claim, a plaintiff

---

[39] The Court evaluates the remaining claims, Count 4 (the Privacy Claims) and Count 5 (the Administrative Claims), under the lens of dismissal because no outside pleadings are considered.

must establish, by a preponderance of the evidence, the following five elements regarding the

allegedly unauthorized disclosure of information:

1) that the information allegedly disclosed is covered by the Act as a "record" contained in a "system of records";

2) that the agency disclosed the information;

3) that the disclosure was without plaintiff's consent and did not fit within one of the enumerated exceptions to the anti-disclosure provision;

4) that the disclosure was willful or intentional; and

5) that the disclosure had an adverse effect on the plaintiff.

*Fattahi v. Bureau of Alcohol, Tobacco & Firearms*, 186 F. Supp. 2d 656, 659 (E.D. Va. 2002),

*aff'd,* 328 F.3d 176 (4th Cir. 2003).

### 2.    Mr. Jones Fails to Plead a Plausible Unauthorized Disclosure Claim

To establish a Privacy Act unauthorized disclosure claim, a plaintiff must establish, by a

preponderance of the evidence, the above five elements regarding the allegedly unauthorized

disclosure of information.  *Id.*  Here, Mr. Jones simply makes the naked assertion that the

"debarment forced [Mr. Jones] to file his complaint via e-mail without a face-to-face meeting

with any EEO counsel . . . which violated 5 USC 552a, since exchanges of private, sensitive

information occurred over unsecure electronic means." (ECF No. 38, at 14.)  This single

assertion—even under penalty of perjury—does not sufficiently state a cause of action.

Although he does not, even presuming he plausibly alleged the five predicate elements of an

unauthorized disclosure claim, Mr. Jones does not plausibly identify any "actual pecuniary loss"

via "specially pleaded" facts, which is necessary to establish the element of "actual damages" of

that claim.  *FAA v. Cooper*, 132 S.Ct. 1441, 1451–52 (2012).  Even accepting Mr. Jones's

43

allegations as true, he does not plausibly plead each element of his claim.  Accordingly, the

Court will dismiss the unauthorized disclosure Privacy Act claim Mr. Jones raises in Count 4.

### 3.  Legal Standard:  Demonstrating Denial of Access Under the Privacy Act

A plaintiff may bring a Denial of Access claim under the Privacy Act, 5 U.S.C. § 552a, if

the agency "refuses to comply with an individual request [for his personnel record]."  *See*

§ 552a(g)(1)(B).  Section (d) of the Act provides, in pertinent part:

> (d) Access to records. —Each agency that maintains a system of record
> shall—
>
>> (1) upon request by any individual to gain access to his record or to
>> any information pertaining to him which is contained in the system,
>> permit him and upon his request, a person of his own choosing to
>> accompany him, to review the record and have a copy made of all
>> or any portion there in a form comprehensible to him.

§ 552a(d)(1).  The Act also authorizes government agencies to promulgate rules regulating the

process.  *See* 5 U.S.C. § 552a(f)(3).

If any agency "refuses to comply with an individual request under subsection (d)(1)[,] . . .

the individual may bring a civil action against the agency," 5 U.S.C § 552a(g)(1), but the

individual must first exhaust his or her administrative remedies by filing a request with the

agency prior to initiating suit for review by a district court, *Pollack v. Dep't of Justice*, 49 F.3d

115, 116 n.1 (4th Cir. 1995).

To state a claim in federal district court for denial of access, a plaintiff must show

"(1) that a request for records was made; (2) that the request was denied; and (3) that such a

denial or failure to act was improper under the Privacy Act."  *Biondo v. Dep't of Navy*, 928 F.

Supp. 626, 631 (D. S.C. 1995) *aff'd* 86 F.3d 1148 (4th Cir. 1996) (citing 5 U.S.C. § 552a(d)(1),

(g)(1)(B), (g)(3)(A)).

**4.    Even Read Favorably, Mr. Jones's Denial of Access Claim Fails Because He Does Not Plead That He Made a Proper Request for the Files and That the Request Was Denied**

As to the denial of access of records claim, while Mr. Jones correctly explains that the Privacy Act requires access to records, the Act also authorizes government agencies to promulgate rules regulating the access process.  If any agency "refuses to comply with an individual request under subsection (d)(1)[,] . . . the individual may bring a civil action against the agency," 5 U.S.C § 552a(g)(1)(b), but the individual must first exhaust his or her administrative remedies by filing a request with the agency prior to initiating suit for review by a district court, *Pollack*, 49 F.3d at 117 n.1.  To state a claim in federal district court for denial of access, a plaintiff must show "(1) that a request for records was made; (2) that the request was denied; and (3) that such a denial or failure to act was improper under the Privacy Act." *Biondo*, 928 F. Supp. at 630 (citing 5 U.S.C. § 552a(d)(1), (g)(1)(B), (g)(3)(A)).

Even construing his complaint liberally and accepting the allegations as true, Mr. Jones has not stated facts showing that he made a proper request for records under DLA's rules, nor has he shown that DLA's response was improper according to those rules.  Mr. Jones does not show that he properly filed a request in accordance with DLA's procedure.  He baldly asserts that he was asked to file a FOIA request, which he claims "violated 5 [U.S.C.] 552(a)(d)(1) and (d)(2)." (ECF No. 38 at 22.)  Any FOIA interaction is irrelevant to his Privacy Act claim.  Mr. Jones does not allege why the invitation for him to file a FOIA would be relevant.  Instead, he alleges in conclusory fashion that this directive violated the Privacy Act.  Even if the Court were to presume that it did violate the Privacy Act, Mr. Jones's claim would nonetheless founder at the most basic level:  he never alleges that he filed a Privacy Act request that resulted in a denial

of access. He never states that he was asked to file a FOIA after he properly filed a Privacy Act request, if that Privacy Act request was denied, and if the denial was improper under the Act.

Accordingly, Mr. Jones's Privacy Act claims must be dismissed because even read liberally and accepted as true, he fails to plead plausible denial of access and unauthorized disclosure claims. The Court will grant the Motion to Dismiss as to Count 4.

### F. Mr. Jones's 29 CFR, 5 U.S.C. § 6329b, 32 CFR § 2004, and PL 111-292 Claims Must Be Dismissed Because He Fails to Comply with the Requirements of the Federal Rules of Civil Procedure

In Count 5, Mr. Jones contends that DLA "violated the administrative and procedural aspects of 29 CFR, 5 U.S.C. [§] 6329b, 32 CFR [§] 2004," and PL 111-292. (ECF No. 38, at 3–4). The Government contends that Mr. Jones "fails any ostensible effort he makes to comply with the Requirements of Fed. R. Civ. P. 8(a)" because his allegations fail to give the Government fair notice of his claim and the grounds upon which it rests. (ECF No. 42, at 17.) This Court agrees. *See* n. 29, p. 28, *supra*.

Federal Rule of Civil Procedure 8 provides that "[a] pleading that states a claim for relief must contain," among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief," and allegations that are "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 8(d)(1).

One purpose of the pleading requirements set forth in the Federal Rules is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bolton v. Chesterfield Cty. Sch. Bd.*, No. 3:19cv558, 2020 U.S. Dist. LEXIS 177072, at *5 (E.D. Va. Sept. 25, 2020) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see Mueller v. Henrico Cty. Sch. Bd.*, No. 3:18cv848, 2020 U.S. Dist. LEXIS 164920, at *10 (E.D. Va. Sept. 9, 2020). "Another purpose is to 'frame[] the issue[s] and provide the basis for

46

informed pretrial proceedings.'" *JTH Tax, Inc. v. Hines*, No. 2:15cv558, 2017 U.S. Dist. LEXIS

136284, at \*5 (E.D. Va. July 19, 2017) (alterations in original) (quoting *Stanard v. Nygren*, 658

F.3d 792, 797 (7th Cir. 2011)), *adopted by* 2017 U.S. Dist. LEXIS 136287 (E.D. Va. Aug. 24,

2017).  In determining whether a plaintiff's pleading complies with the Federal Rules, courts

consider, among other things, "whether the [pleading] was clear enough to enable the [opposing

party] to know how to defend himself." *Id.* (alterations in original) (citation omitted).

Although courts are required to liberally construe complaints filed by *pro se* litigants, this

principle "has its limits." *Suggs v. M&T Bank*, 230 F. Supp. 3d 458, 461 (E.D. Va. 2017).

"Even *pro se* plaintiffs must recognize Rule 8's vision for 'a system of *simplified pleadings* that

give[s] notice of the general claim asserted, allow[s] for the preparation of a basic defense,

narrow[s] the issue to be litigated, and provide[s] a means for quick dispositions of sham

claims.'" *Mueller*, 2020 U.S. Dist. LEXIS 164920, at \*10 (emphasis in original) (quoting

*Sewraz v. Morchower*, No. 3:08cv100, 2009 U.S. Dist. LEXIS 6007 at \*2 (E.D. Va. Jan. 28,

2009)).  Further, although liberal construction of *pro se* complaints is required, the Court "cannot

act as a *pro se* litigant's 'advocate and develop, *sua sponte*, statutory and constitutional claims

that the [litigant] failed to clearly raise on the face of [the] complaint.'" *Bolton*, 2020 U.S. Dist.

LEXIS 177072 at \*5 (alterations in original) (quoting *Newkirk v. Circuit Court*, No. 3:14cv372,

2014 U.S. Dist. LEXIS 113032, at \*3 (E.D. Va. Aug. 13, 2014)).

Upon review of Mr. Jones's Second Amended Complaint, even read liberally and

favorably to Mr. Jones, the Government's Motion, and the parties' briefs, the Court concludes

that Mr. Jones's claims regarding 29 CFR, 5 U.S.C. § 6329b, 32 CFR § 2004, and PL 111-292

fail to comply with the federal pleading standards set forth in Fed. R. Civ. P. 8.  Specifically, Mr.

Jones's Second Amended Complaint (i) does not contain "a short and plain statement of [these]

claim[s]"; and, (ii) does not contain "simple, concise, and direct" allegations. Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 8(d)(1). Due to these failures, the Court and the Government are left to "speculate as to the relevance of many of the statements contained in the [Second Amended Complaint], rendering the task of piecing together what has happened in th[e] case impracticable." *Mueller*, 2020 U.S. Dist. LEXIS 164920, at *12 (dismissing a *pro se* plaintiff's complaint for failure to comply with federal pleading standards); *see Bolton*, 2020 U.S. Dist. LEXIS 177072, at *7-8 (same). Further, the Court finds that attempts to discern Mr. Jones's claims under these circumstances could result in improper "advocating" or *sua sponte* claim development by the Court. *Mueller*, 2020 U.S. Dist. LEXIS 164920, at *12 (explaining that "the Court cannot risk advocating or developing statutory or constitutional claims *sua sponte*").

For the foregoing reasons, the Court will grant the motion to dismiss as to Count 5 because Jones fails to articulate viable claims under 29 CFR, 5 U.S.C. § 6329b, 32 CFR § 2004, and PL 111-292.

## IV.  Conclusion

For the foregoing reasons, the Court GRANTS DLA's Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, Motion for Summary Judgment. (ECF No. 41.)  The Court GRANTS the Motion to Dismiss as to Claims 1 (the Constitutional Violations); 4 (the Privacy Act Violations), and 5 (the Administrative Violations). (ECF No. 41.)  The Court GRANTS the Motion for Summary Judgment as to Claims 2 (the APA

Violation) and Claim 3 (the FOIA Violation).  (ECF No. 41.)  Accordingly, Mr. Jones's Second

Amended Complaint, (ECF No. 38), is DISMISSED WITH PREJUDICE.

      An appropriate order shall issue.

Date:  9-1-2023
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

49